AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Sudheesh Raghavan Nambiar | ) | Case No.  <span style="color:red">**CR 26-70393-MAG**</span> |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

**FILED**

Apr 07 2026

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of   January 2019 through May 2024   in the county of   Santa Clara   in the
Northern   District of   California  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

This criminal complaint is based on these facts:

See attached affidavit of IRS-CI Special Agent Jose Silva.

☑ Continued on the attached sheet.

/s/
*Complainant's signature*

Jose Silva, Special Agent, IRS-CI
*Printed name and title*

Approved as to form  /s/ Zachary Abrahamson
AUSA

Sworn to before me by telephone.

Date:   4/7/2026

*Judge's signature*

City and state:   San Jose, CA

Hon. Nathanael M. Cousins
*Printed name and title*

## <u>AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR AN ARREST WARRANT AND CRIMINAL COMPLAINT</u>

I, Jose Silva, a Special Agent of the Internal Revenue Service – Criminal Investigation (IRS-CI), being sworn, hereby declare as follows:

### <u>INTRODUCTION</u>

1. I submit this affidavit in support of an application for an arrest warrant and criminal complaint charging Sudheesh Nambiar with knowingly devising a scheme to defraud carried out in part by interstate wire communications in violation of 18 U.S.C. § 1343 (wire fraud), and with laundering the proceeds of that scheme in violation of 18 U.S.C. § 1957 (money laundering).

2. The facts in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents and witnesses. This affidavit does not set forth all of my knowledge about this matter; it is intended only to show that there is sufficient probable cause for the requested warrant.

### <u>AFFIANT BACKGROUND</u>

3. I am employed as a Special Agent with the Internal Revenue Service – Criminal Investigation assigned to the Oakland Field Office and have been so employed since January 2024. As an IRS – CI Special Agent, I am authorized to investigate criminal violations of the Internal Revenue Code (Title 26, United States Code), Money Laundering Statutes (Title 18, United States Code), Bank Secrecy Statutes (Title 31, United States Code), and other related offenses. I am a law enforcement officer with authority to execute warrants issued under the authority of the United States.

4. I completed the required Special Agent training at the Federal Law Enforcement Training Center in Glynco, Georgia. This training consisted of approximately three months of criminal investigative training including courses in law enforcement techniques, federal criminal statutes, conducting criminal investigations, the execution of search warrants, and the law governing searches and seizures. In addition to the criminal investigative training, I completed a Special Agent Investigative Techniques course lasting three months, which included courses in financial

investigative techniques, legal principles, and statutes representing criminal violations of the United Stated Code as enumerated in Titles 18, 26, and 31.

5.      Prior to my current position as a Special Agent, I was employed as Revenue Officer with the IRS. As a Revenue Officer, I conducted financial investigations of individuals and entities, including sole proprietorships, corporations, and partnerships which involved several different tasks and procedures. I received training in federal tax law and collection techniques and practices to review the financial health of individuals and businesses, determine their collectability, identify situations with potential hidden or understated income and assets, and to recognize potential fraud. In 2021, I obtained a Bachelor of Business Administration degree in Accounting from the University of Texas at El Paso located in El Paso, Texas.

### APPLICABLE STATUTES

6.      *Title 18, United States Code, Section 1343* reads in pertinent part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

7.      *Title 18, United States Code, Section 1957.* 18 U.S.C. § 1957 criminalizes certain activities that constitute money laundering. Specifically, the section bars knowingly engaging or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from a specified unlawful activity. *See* 18 U.S.C. § 1957.

### STATEMENT OF PROBABLE CAUSE

8.      Sudheesh Nambiar is a 39-year-old male currently residing in Milpitas, CA. In or about 2018, Nambiar embarked on an investment fraud scheme that appears to have implicated more than

$40 million from more than 400 investors. Based on the evidence and interviews that I have obtained or reviewed in this investigation, Nambiar maintained the fraud through a variety of tactics: lying about his success and the profits he made trading the investors' money, lying about the performance of the trading fund in order to induce new investors and investments, fabricating documents to show false trading success and false investor balances, pitching other fraudulent investment opportunities, and funding investor withdrawals with other investors' new investments—activity characteristic of a Ponzi scheme.

9.      The investigation into Nambiar's conduct has established probable cause to believe that Nambiar knowingly devised a scheme to defraud carried out in part by interstate wire communications in violation of 18 U.S.C. § 1343 (wire fraud), and laundered the proceeds of that scheme in violation of 18 U.S.C. § 1957 (money laundering).

**A.  In 2018, Sudheesh Nambiar started a pooled investment fund.**

10.     In or around early 2018, Nambiar maintained a Telegram group chat in which he charged members a monthly fee in exchange for investment advice. That year, Nambiar apparently recruited members that were paying the fee to join a pooled investment fund that Nambiar would manage, which he called Spartan Trading.

11.     On or about November 9, 2018, Nambiar created a new Telegram group chat for investors in Spartan Trading. Investors who had access to the Telegram group chat later shared its contents with investigators; I therefore understand the group's name to be "Spartan Trade Invest Group," and refer to it accordingly herein. Over the next five years, Nambiar sent Spartan Trade Invest Group thousands of Telegram messages, including hundreds containing false representations about the performance of Nambiar's investments.

**B.  Between 2019 and 2024, Nambiar made material false statements and omitted material facts about his investing performance.**

12.     The evidence obtained in this investigation shows that Nambiar induced investors to invest or add to their positions by lying repeatedly and materially about returns. Beginning in January

2019, per Telegram messages later obtained from Nambiar investors, Nambiar sent spreadsheets purporting to summarize his fund's performance. These spreadsheets, examples of which appear below as Figures 1 & 2, almost universally claimed positive daily returns.

13.    **Figure 1: Excerpt of Nambiar's claimed investment returns, Nov. 2018–Mar. 2019**

| Account Grand total | $ 419,710.00 | | | | | | |
|---|---|---|---|---|---|---|---|
| Gross Profit | $ 199,710.00 | | | | | | |
| Net Profit Member | $ 139,797.00 | | | | | | |
| Net Profit Sud | $ 59,913.00 | | | | | | |
| Multiplier | 1.635440909 | 63.5441% | | | | | |

| Total blocks | Entry Amount | Net Profit | Net Total | | Month | Gross % Gain | Net % Gain |
|---|---|---|---|---|---|---|---|
| 1 | $ 1,000.00 | $ 635.44 | $ 1,635.44 | | Nov-18 | 21.93% | 15.35% |
| 2 | $ 2,000.00 | $ 1,270.88 | $ 3,270.88 | | Dec-18 | 6.45% | 4.51% |
| 3 | $ 3,000.00 | $ 1,906.32 | $ 4,906.32 | | Jan-19 | 24.11% | 16.88% |
| 4 | $ 4,000.00 | $ 2,541.76 | $ 6,541.76 | | Feb-19 | 14.92% | 10.45% |
| 5 | $ 5,000.00 | $ 3,177.20 | $ 8,177.20 | | Mar-19 | 6.44% | 4.51% |
| 220 | $ 220,000.00 | $139,797.00 | $359,797.00 | | | | |

| | Principle | Total | Profit/Loss | Daily Change | Net Profit | Gross Profit | Avg Gain % |
|---|---|---|---|---|---|---|---|
| 11/20/2018 | $ 220,000.00 | $220,000.00 | $ - | 0.00% | 0.00% | 0.00% | |
| 11/21/2018 | $ 220,000.00 | $226,350.00 | $ 6,350.00 | 2.89% | 2.02% | 2.89% | 2.89% |
| 11/26/2018 | $ 226,350.00 | $232,950.00 | $ 6,600.00 | 2.92% | 4.12% | 5.89% | 2.94% |
| 11/27/2018 | $ 232,950.00 | $239,050.00 | $ 6,100.00 | 2.62% | 6.06% | 8.66% | 2.89% |
| 11/28/2018 | $ 239,050.00 | $261,050.00 | $ 22,000.00 | 9.20% | 13.06% | 18.66% | 4.66% |
| 11/30/2018 | $ 261,050.00 | $268,250.00 | $ 7,200.00 | 2.76% | 15.35% | 21.93% | 4.39% |
| 12/3/2018 | $ 268,250.00 | $276,450.00 | $ 8,200.00 | 3.06% | 17.96% | 25.66% | 4.28% |
| 12/4/2018 | $ 276,450.00 | $281,250.00 | $ 4,800.00 | 1.74% | 19.49% | 27.84% | 3.98% |
| 12/17/2018 | $ 281,250.00 | $285,550.00 | $ 4,300.00 | 1.53% | 20.86% | 29.80% | 3.72% |
| 1/4/2019 | $ 285,550.00 | $290,750.00 | $ 5,200.00 | 1.82% | 22.51% | 32.16% | 3.57% |
| 1/7/2019 | $ 290,750.00 | $295,350.00 | $ 4,600.00 | 1.58% | 23.98% | 34.25% | 3.43% |
| 1/10/2019 | $ 295,350.00 | $298,550.00 | $ 3,200.00 | 1.08% | 24.99% | 35.70% | 3.25% |
| 1/14/2019 | $ 298,550.00 | $303,650.00 | $ 5,100.00 | 1.71% | 26.62% | 38.02% | 3.17% |
| 1/17/2019 | $ 303,650.00 | $308,810.00 | $ 5,160.00 | 1.70% | 28.26% | 40.37% | 3.11% |
| 1/23/2019 | $ 308,810.00 | $314,910.00 | $ 6,100.00 | 1.98% | 30.20% | 43.14% | 3.08% |
| 1/24/2019 | $ 314,910.00 | $319,710.00 | $ 4,800.00 | 1.52% | 31.73% | 45.32% | 3.02% |
| 1/28/2019 | $ 319,710.00 | $321,010.00 | $ 1,300.00 | 0.41% | 32.14% | 45.91% | 2.87% |
| 1/30/2019 | $ 321,010.00 | $324,910.00 | $ 3,900.00 | 1.21% | 33.38% | 47.69% | 2.81% |
| 1/31/2019 | $ 324,910.00 | $343,110.00 | $ 18,200.00 | 5.60% | 39.17% | 55.96% | 3.11% |
| 2/4/2019 | $ 343,110.00 | $347,910.00 | $ 4,800.00 | 1.40% | 40.70% | 58.14% | 3.06% |
| 2/13/2019 | $ 347,910.00 | $356,710.00 | $ 8,800.00 | 2.53% | 43.50% | 62.14% | 3.11% |
| 2/20/2019 | $ 356,710.00 | $366,910.00 | $ 10,200.00 | 2.86% | 46.74% | 66.78% | 3.18% |
| 2/25/2019 | $ 366,910.00 | $375,810.00 | $ 8,900.00 | 2.43% | 49.58% | 70.82% | 3.22% |
| 2/27/2019 | $ 375,810.00 | $385,810.00 | $ 10,000.00 | 2.66% | 52.76% | 75.37% | 3.28% |

//

//

//

//

14.    **Figure 2: Excerpt of Nambiar's claimed investment returns, June 2021–Aug. 2021**

| | | | | Spartan Investment | | |
|---|---|---|---|---|---|---|
| Account Grand total | $ 5,337,700 | | | **Month** | **Gross % Gain** | **Net % Gain** |
| Gross Profit | $ 507,700 | | | Jul-21 | 4.25% | 2.98% |
| Net Profit Member | $ 355,390 | | | Aug-21 | 5.52% | 3.86% |
| Net Profit Sud | $ 152,310 | | | Sep-21 | 0.71% | 0.50% |
| Multiplier | 1.07357971 | 7.3580% | | | | |

| | Phase 1 | Phase 2 | Phase 3 | Phase 4 | Phase 5 | Phase 6 | Phase 7 |
|---|---|---|---|---|---|---|---|
| Entry | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 |
| Phase 1 Profit | $ 730 | $ - | $ - | $ - | $ - | $ - | $ - |
| Phase 2 Profit | $ 467 | $ 270 | $ - | $ - | $ - | $ - | $ - |
| Phase 3 Profit | $ 366 | $ 212 | $ 167 | $ - | $ - | $ - | $ - |
| Phase 4 Profit | $ 327 | $ 189 | $ 149 | $ 128 | $ - | $ - | $ - |
| Phase 5 Profit | $ 222 | $ 129 | $ 101 | $ 87 | $ 77 | $ - | $ - |
| Phase 6 Profit | $ 297 | $ 171 | $ 135 | $ 116 | $ 103 | $ 95 | $ - |
| Phase 7 Profit | $ 456 | $ 264 | $ 208 | $ 178 | $ 158 | $ 147 | $ 134 |
| Phase 8 Profit | $ 283 | $ 163 | $ 129 | $ 110 | $ 98 | $ 91 | $ 83 |
| Phase 9 Profit | $ 276 | $ 160 | $ 126 | $ 108 | $ 96 | $ 89 | $ 81 |
| Phase 10 Profit | $ 278 | $ 161 | $ 127 | $ 108 | $ 96 | $ 89 | $ 82 |
| Phase 11 Profit | $ 346.06 | $ 200.04 | $ 157.51 | $ 135.02 | $ 119.73 | $ 111.17 | $ 101.50 |
| Net Total | $ 5,049 | $ 2,919 | $ 2,298 | $ 1,970 | $ 1,747 | $ 1,622 | $ 1,481 |
| Growth % | 404.9% | 191.9% | 129.8% | 97.0% | 74.7% | 62.2% | 48.1% |
| 48300 | $ 4,830,000 | | $ 355,390 | $ 5,185,390 | | | |

| | | Principle | Total | Profit/Loss | Daily Change | Net Profit | Gross Profit | Avg Gain % |
|---|---|---|---|---|---|---|---|---|
| Su | 6/20/2021 | $ 4,830,000 | $ 4,830,000 | $ - | 0.00% | 0.00% | 0.00% | |
| Mo | 6/21/2021 | $ 4,830,000 | $ 4,842,400 | $ 12,400 | 0.26% | 0.18% | 0.26% | 0.26% |
| We | 6/23/2021 | $ 4,842,400 | $ 4,860,900 | $ 18,500 | 0.38% | 0.45% | 0.64% | 0.32% |
| Th | 6/24/2021 | $ 4,860,900 | $ 4,874,300 | $ 13,400 | 0.28% | 0.64% | 0.92% | 0.31% |
| Fr | 6/25/2021 | $ 4,874,300 | $ 4,881,100 | $ 6,800 | 0.14% | 0.74% | 1.06% | 0.26% |
| Mo | 6/28/2021 | $ 4,881,100 | $ 4,895,900 | $ 14,800 | 0.30% | 0.96% | 1.36% | 0.27% |
| Tu | 6/29/2021 | $ 4,895,900 | $ 4,905,600 | $ 9,700 | 0.20% | 1.10% | 1.57% | 0.26% |
| Tu | 7/6/2021 | $ 4,905,600 | $ 4,920,100 | $ 14,500 | 0.30% | 1.31% | 1.87% | 0.27% |
| We | 7/7/2021 | $ 4,920,100 | $ 4,925,900 | $ 5,800 | 0.12% | 1.39% | 1.99% | 0.25% |
| Th | 7/8/2021 | $ 4,925,900 | $ 4,936,200 | $ 10,300 | 0.21% | 1.54% | 2.20% | 0.24% |
| Fr | 7/9/2021 | $ 4,936,200 | $ 4,946,000 | $ 9,800 | 0.20% | 1.68% | 2.40% | 0.24% |
| Tu | 7/13/2021 | $ 4,946,000 | $ 4,960,800 | $ 14,800 | 0.30% | 1.90% | 2.71% | 0.25% |
| We | 7/14/2021 | $ 4,960,800 | $ 4,964,200 | $ 3,400 | 0.07% | 1.94% | 2.78% | 0.23% |
| Th | 7/15/2021 | $ 4,964,200 | $ 4,974,600 | $ 10,400 | 0.21% | 2.10% | 2.99% | 0.23% |
| We | 7/21/2021 | $ 4,974,600 | $ 4,982,400 | $ 7,800 | 0.16% | 2.21% | 3.16% | 0.23% |
| Fr | 7/23/2021 | $ 4,982,400 | $ 4,987,300 | $ 4,900 | 0.10% | 2.28% | 3.26% | 0.22% |
| Mo | 7/26/2021 | $ 4,987,300 | $ 5,003,900 | $ 16,600 | 0.33% | 2.52% | 3.60% | 0.23% |
| We | 7/28/2021 | $ 5,003,900 | $ 5,025,000 | $ 21,100 | 0.42% | 2.83% | 4.04% | 0.24% |
| Th | 7/29/2021 | $ 5,025,000 | $ 5,035,300 | $ 10,300 | 0.20% | 2.98% | 4.25% | 0.24% |
| Mo | 8/2/2021 | $ 5,035,300 | $ 5,050,100 | $ 14,800 | 0.29% | 3.19% | 4.56% | 0.24% |
| Tu | 8/3/2021 | $ 5,050,100 | $ 5,051,600 | $ 1,500 | 0.03% | 3.21% | 4.59% | 0.23% |
| Th | 8/5/2021 | $ 5,051,600 | $ 5,081,000 | $ 29,400 | 0.58% | 3.64% | 5.20% | 0.25% |
| Mo | 8/9/2021 | $ 5,081,000 | $ 5,089,800 | $ 8,800 | 0.17% | 3.77% | 5.38% | 0.24% |
| Tu | 8/10/2021 | $ 5,089,800 | $ 5,110,800 | $ 21,000 | 0.41% | 4.07% | 5.81% | 0.25% |
| We | 8/11/2021 | $ 5,110,800 | $ 5,130,300 | $ 19,500 | 0.38% | 4.35% | 6.22% | 0.26% |
| Th | 8/12/2021 | $ 5,130,300 | $ 5,146,400 | $ 16,100 | 0.31% | 4.59% | 6.55% | 0.26% |
| Fr | 8/13/2021 | $ 5,146,400 | $ 5,159,300 | $ 12,900 | 0.25% | 4.77% | 6.82% | 0.26% |

15.    These spreadsheets and reports had the purpose and effect of bolstering investor confidence in Nambiar's trading. Multiple investors later told government investigators that they

reviewed spreadsheets like Figures 1 & 2 prior to increasing their positions with Nambiar. For example, Investor 1—who invested and lost approximately $2 million in the scheme—later told investigators that he reviewed Nambiar's Telegram group on weekends and was left with the impression that Nambiar excelled at trading and consistently earned profits.

16.    I have investigated significant aspects of Nambiar's performance claims and found those claims to be false. For example, Nambiar in or around December 2020, Nambiar told participants in the Spartan Trade Invest Group that the fund's annual gross gains for 2019 and 2020 were 338.55 percent and 62.18 percent, respectively. Two years later, on or around December 29, 2022, Nambiar told participants in that group that the fund's annual gross gain for 2022 was 32.13 percent.

17.    To assess those representations, I and other law enforcement agents obtained financial records from financial institutions and identified about 26 active checking and savings accounts that Nambiar controlled and that received investor funds ("Nambiar Bank Accounts").  I then reviewed activity in the Nambiar Bank Accounts and identified about 15 brokerage accounts held at seven different brokerage companies that received significant transfers from the Nambiar Bank Accounts between 2018 and 2024 ("Nambiar Brokerage Accounts"). Based on my review of these financial records, I believe that the Nambiar Brokerage Accounts together account for almost all Nambiar trades involving investor funds between 2019 and 2024.

18.    I determined that Nambiar's investments across the Nambiar Brokerage Accounts in fact *lost* money in 2019, 2020, and 2022.  Figure 3 presents Nambiar's claimed return for those years alongside my estimate of his true performance.

| Year | Nambiar's claimed gross return | Estimated true return |
|---|---|---|
| 2019 | Gain of 339% | Loss of $990K – $1.0M |
| 2020 | Gain of 62% | Loss of $2.3M – $3.7M |
| 2022 | Gain of 32% | Loss of $5.9M – $6.2M |

19. Despite knowing these losses, Nambiar told investors that they could expect—and, once invested, that they had earned—outsized returns from investing with him. For example, Nambiar in or around December 2019 told Investor 1 that he could expect a 25 percent return from investing with Nambiar—even though Nambiar knew that his losses over 2018 and 2019 totaled roughly $1 million or more. Two years later, in July 2021, he told Investor 2 that he could also expect a 25 percent annual return—despite the fact that, in 2020, Nambiar's trades netted millions of dollars in losses.

20. To match those misleading expectations, Nambiar appears to have fabricated account statements that he personally sent to investors who sought fund updates. For example, on or about February 27, 2022, Nambiar sent Investor 2 a spreadsheet claiming that the balance of Investor 2's investments with Nambiar as of January 1, 2022 was about $330,000. But my review of Nambiar's active brokerage accounts at that time suggests that Nambiar's *overall* balance—across *all* investors, not only Investor 2—was only about $212,000. Later, in or around early 2023, Nambiar sent Investor 3 an account statement claiming that Investor 3's balance with Nambiar as of January 31, 2023 was almost $300,000. But that month, Nambiar's ending overall balance across active brokerage accounts was only about $11,500.

21. Consistent with these false growth claims, Nambiar also appears to have lied about his fund's principal over time. Around year-end in 2020, 2021, and 2022, Nambiar told participants in the Spartan Trade Invest Group that the "Account Grand total" was, respectively, $5.5 million, $5.8 million, and $6.1 million. But Nambiar's year-end aggregate brokerage balance across the Nambiar Brokerage Accounts that I reviewed never exceeded $350,000 in any of those years, and by year-end 2022 had fallen to approximately $2,000.[1]

---

[1] Nambiar last sent the Telegram group an "Account Grand total" figure on or about November 7, 2023. Then, he told the group that the "Account Grand total" was about $4.7 million. My review of Nambiar's brokerage accounts, however, determined that Nambiar held only about $51,000 across those accounts at the end of October 2023 and even less—about $12,500—at the end of November 2023.

**C. Between 2019 and 2024, Nambiar made material false statements and omitted material facts about the risks of his investing.**

22.     In addition to the above false statements about performance, investigation suggests that Nambiar lied repeatedly and materially to investors about the risks of his investment strategy.

23.     At the scheme's outset and throughout, Nambiar portrayed his investment strategy as conservative. In November 2018, as he recruited initial investors for the fund, Nambiar told participants in the Spartan Trade Invest Group that he had "[a] loss threshold of 30 percent. That's what I am considering maximum risk." Later, he told multiple investors—who relayed Nambiar's comments to investigators—that he only invested a small percentage of his fund's overall principal, leaving the remainder as cash. Finally, Nambiar during the scheme apparently sought to bolster investor confidence by claiming that his personal net worth ran into the tens of millions: In December 2022, Nambiar messaged an investor, during a conversation about investment guarantees, that Nambiar possessed $44 million in personal funds.

24.     Investigation to date suggests that these representations were materially false and misleading. I reviewed statements from the Nambiar Brokerage Accounts and identified no dedicated cash reserve.  Nor did Nambiar appear to maintain cash reserves in checking or savings accounts at the Nambiar Bank Accounts that I reviewed.

25.     Rather than set cash aside, Nambiar apparently *borrowed* to maintain the scheme. Per subpoenaed bank records, Nambiar by March 2019 began borrowing to obtain money to trade. These loans started small: In 2019, Nambiar received about $200,000 from merchant cash advance businesses. But they soon swelled: By 2023, according to my analysis of subpoenaed bank records, Nambiar received $3.6 million from these and similar sources. In one notable example, Nambiar on May 18, 2021 received $250,000 from a merchant cash advance company into a Bank 1 checking account with a balance of about $1,600. The day after receiving the infusion, Nambiar transferred $220,000 to brokerage accounts at trading platform Brokerage 1.

26. These loans came at a cost: Nambiar repaid these lenders significantly more than the sums lent, likely reflecting punitive rates of interest. Figure 4 shows cash advances received and repaid by Nambiar that I identified by reviewing the Nambiar Bank Accounts.



27. Nambiar apparently never disclosed to participants in the Spartan Trade Invest Group that he funded trading in part with borrowed funds. Multiple investors also told investigators that Nambiar never disclosed his reliance on borrowed funds—and that such reliance would have been material to the investors' decisions to invest or add to positions with Nambiar.

28. Finally, investigation to date suggests that Nambiar's representations about his personal net worth—likely intended to boost investors' confidence about handing their savings to Nambiar— were materially misleading. For example, in connection with Nambiar's December 2022 claim to hold $44 million in personal funds, I reviewed the Nambiar Bank Accounts and Nambiar Brokerage Accounts and determined that those accounts held just under $30,000 at the time.

**D. Around 2022 and after, Nambiar made material false statements and omitted material facts about a purported "bridge loan" investment scheme.**

29. Investigation to date also suggests that Nambiar lied repeatedly and materially about a purported real estate investment opportunity. Investigation to date suggests that this purported

opportunity was a ruse to generate high-dollar inflows at a time when Nambiar needed funds to satisfy investor withdrawal requests.

30.    In or about late 2022, Nambiar told participants in the Spartan Trade Invest Group that he was "in process to start a new venture for next year," suggesting that the "venture" would pertain to real estate. In January 2023, Nambiar asked participants in the group to message him if "interested in the bridge l[oan] venture," which he later described as a product for "[a]ny one looking to buys [*sic*] house looking for down payment with money stuck in equity in the first home."

31.    Multiple investors in Nambiar's fund later described to government investigators Nambiar's pitch regarding this "bridge loan" venture. Investor 2 provided investigators with messages from Nambiar that "bridge loan" funds would be returned with interest in 45 days. Investor 4 told investigators that Nambiar asked Investor 4 to invest at least $50,000 into the scheme and solicited Investor 4 after providing an unprompted "investment update" that purported to show significant gains by Investor 4's earlier investments in Nambiar's fund.

32.    Investigation to date suggests that these representations were false. I have reviewed the Nambiar Bank Accounts and observed that, where I have identified inbound transfers from "bridge loan" investors, I have observed that those transfers often occur contemporaneously with payments to other investors that Nambiar could not have made from the paying account but for the "bridge loan" investment. Below, I list two examples of such Ponzi-like activity associated with "bridge loan" investments:

    a.    On or about November 24, 2023, Investor 2 wired $30,000 to a Nambiar Bank 1 account ending x0328. Investor 2 later described this wire as "Bridge Fund" in documents provided to investigators. The x0328 account in which Investor 2's wire landed held about $1,150 prior to Investor 2's wire. The day that the wire arrived—November 24, 2023—Nambiar transferred approximately $20,000 to another investor.

    b.    On or about December 8, 2022, Investor 2 and another investor sent Nambiar's Bank 1 account ending x0328 two wires totaling $100,000. Wire records relate the transfers to

"Br[i]dge Fund" or "Bridge Loan," respectively. The x0328 account in which the wires landed held about $400 prior to the wires. On the day the wires landed—December 8, 2023—Nambiar transferred $45,000 to a different investor in two transactions described as "Repayment."

33.    Finally, at least one investor— Investor 4—later told investigators that Nambiar admitted wrongdoing with respect to the "bridge loan" scheme. Investor 4 told investigators that he invested $34,000 in Nambiar's "bridge loan" scheme after a January 2023 solicitation by Nambiar. Nambiar later told Investor 4—according to a July 2024 FBI interview of Investor 4 that I have reviewed—that Nambiar never actually lent investor funds in connection with any "bridge loans" and only took Investor 4's money to cover trading losses.

**E.  Nambiar made material false statements and omitted material facts about his use of investor assets.**

34.    Nambiar also appears to have diverted investor funds to personal spending, debt repayment, and Ponzi-like payments to other investors requesting withdrawals. Investigation to date suggests that Nambiar never disclosed these material facts to investors.

35.    At least by 2021, Nambiar apparently began to appropriate investor fund transfers for personal purposes. For example, on August 16, 2021, Nambiar's Bank 1 x0328 checking account ended the day with a balance of about $1,500. The next day, August 17, that account received a $300,000 Fedwire transfer from an investor. That same day, Nambiar paid $6,000 in credit card bills from the account. The following day, Nambiar paid almost $63,000 more to other credit cards.

36.    Nambiar also apparently appropriated funds to repay merchant cash advance loans. For example, Nambiar opened an account ending x0328 at Bank 1 around December 30, 2020. Days later, on January 4, 2021, its balance stood at $1,000. Nambiar then received about $290,000 through a series of four investor transfers over the following three days. After receiving those funds, Nambiar on January 7 wired $10,000 to Lender 1, a cash advance company from which Nambiar received more than $300,000 in funding between 2019 and 2024. A week later, on January 12, 2021,

Nambiar's balance in the same account had fallen to about $10. Over the following two days, Nambiar received $400,000 in transfers from a single investor before wiring Lender 1 $10,000 on January 14 and $20,000 on January 15.

37.     Aside from personal spending and debt repayments, Nambiar also used new contributions to fund requested withdrawals—activity characteristic of a Ponzi scheme. For example, in August 2022, Investor 1 faced a significant tax liability and requested to withdraw $100,000 from funds invested with Nambiar. On or about August 16, 2022, Nambiar's Bank 1 x0328 checking account had a balance of about $1,000. The next day, that account received an $80,000 Fedwire from a different investor—after which Nambiar wired $60,000 to Investor 1.

38.     Multiple investors later told investigators that these facts would have been material to their decisions to invest or add to their positions with Nambiar. For example, Investor 5 told investigators that he would not have permitted Nambiar to use Investor 5's investment to pay Nambiar's credit cards or to fund other investors' withdrawals.

**F.    In late 2023 and after, Nambiar made material false statements and omitted material facts about the health of his finances and the disposition of investor assets as his scheme collapsed.**

39.     Investigation to date suggests that Nambiar's scheme began to collapse in or around late 2023.  I have reviewed bank and brokerage accounts held by Nambiar at or around that time, and by December 2023 none of the Nambiar Brokerage Accounts had a balance exceeding $550.  As for checking and savings accounts, none of the Nambiar Bank Accounts then had a balance exceeding $350.

40.     Contemporaneously with this apparent liquidity crisis, Nambiar made false representations apparently intended to buy time or slow the pace of investor withdrawals. On or about December 18, 2023, Nambiar told participants in the Spartan Trade Invest Group that he would not "be availble [*sic*] for nex[t] 4-5 days" due to "[t]ax audit issues." About a month later, Nambiar told the group that, "Irs saga hopefully ends Jan 16." But by late February 2024, Nambiar still claimed in group messages to have "back taxes and fine" that prevented him from trading.

41.     Review of IRS information indicates that during this time period there were not audits pending regarding, and no IRS-related fines owed, by Nambiar or any known, associated entity.

42.     Soon after his apparent misrepresentations regarding a tax audit, Nambiar took steps to limit investors' ability to communicate with one another. On or about March 8, 2024, Nambiar appears to have "mute[d]" the Spartan Trade Invest Group, an action that Investor 2 later told investigators precluded group participants from messaging the group. From mid-March onward, Nambiar sent the Spartan Trade Invest Group a stream of messages promising but delaying updates on the status of investor funds. Nambiar in mid-May told investors that he would soon communicate "how and when payout starts." On May 26, 2024, Nambiar promised the Spartan Trade Invest Group "an update here on Tuesday, [May 28]." That was the last message Nambiar sent to Spartan Trade Invest Group.

**G. Investigation to date suggests that Nambiar used interstate wires, or caused them to be used, to carry out essential parts of Nambiar's scheme.**

43.     Nambiar's scheme involved numerous interstate wire transmissions, including Fedwire transfers initiated by investors sending funds from their bank accounts to accounts controlled by Nambiar.  For example, each of the following transfers of funds from investors to Nambiar utilized the Fedwire system, a system operated by the United States Federal Reserve System that involves interstate electronic transmissions to facilitate the transfer of funds:

| DATES | APPROX. AMOUNT | WIRE TRANSMISSION |
|---|---|---|
| Nov. 12, 2021 | $290,000 | Fedwire transfer from Investor 1's bank account to an account controlled by Nambiar |
| Nov. 22, 2021 | $100,000 | Fedwire transfer from Investor 2's bank account to an account controlled by Nambiar |
| Feb. 22, 2022 | $200,000 | Fedwire transfer from Investor 1's bank account to an account controlled by Nambiar |
| May 18, 2022 | $100,000 | Fedwire transfer from Investor 1's bank account to an account controlled by Nambiar |

| DATES | APPROX. AMOUNT | WIRE TRANSMISSION |
|---|---|---|
| Aug. 29, 2022 | $110,000 | Fedwire transfer from Investor 2's bank account to an account controlled by Nambiar |
| Dec. 8, 2022 | $75,000 | Fedwire transfer from Investor 2's bank account to an account controlled by Nambiar |
| Oct. 5, 2023 | $25,000 | Fedwire transfer from Investor 1's bank account to an account controlled by Nambiar |
| Nov. 24, 2023 | $30,000 | Fedwire transfer from Investor 2's bank account to an account controlled by Nambiar |
| Jan. 29, 2024 | $300,000 | Fedwire transfer from Investor 6's bank account to an account controlled by Nambiar |
| Feb. 12, 2024 | $20,001 | Fedwire transfer from Investor 2's bank account to an account controlled by Nambiar |

**H.  There is probable cause to believe that Nambiar violated 18 U.S.C. § 1957 by laundering the proceeds of his fraud.**

44.     In addition to the evidence of fraud above, there is evidence sufficient to establish probable cause to believe that Nambiar laundered at least some fraud proceeds. In particular, Nambiar in August 2022 knowingly transferred $100,000 of fraud proceeds to an account shared by Nambiar and his wife. As explained briefly below, that transaction necessarily implicated more than $10,000 in proceeds from Nambiar's fraud.

45.     In or around August 2022, Nambiar maintained a Bank 1 x0328 checking account. Based on statements for that account that I have reviewed, the account held about $1,500 on Friday, August 26, 2022. The following Monday, August 29, the account received a $110,000 Fedwire transfer from Investor 2, who would later describe the transfer to law enforcement as an investment. That same day, Nambiar transferred $100,000 to a Bank 2 x6525 checking account held by Nambiar and his wife. Between August 26 and Nambiar's $100,000 transfer, the Bank 1 x0328 checking account received only $3,100 in funds untainted by Nambiar's fraud.

46.     Two days after Nambiar's $100,000 transfer landed in his Bank 2 x6525 account, $12,000 was withdrawn from the Bank 2 account to pay credit card bills.

**CONCLUSION**

47.     Based on my training and experience, and the facts and circumstances set forth above, there is probable cause that beginning no later than January 2019 and continuing through in or about May 2024, in the Northern District of California, Sudheesh Nambiar knowingly devised a scheme to defraud carried out in part by interstate wire communications in violation of 18 U.S.C. § 1343 (wire fraud), and laundered the proceeds of that scheme in violation of 18 U.S.C. § 1957 (money laundering). Accordingly, I respectfully request that the Court issue a criminal complaint and warrant for Nambiar's arrest.

**REQUEST FOR SEALING**

48.     I respectfully request that the Court issue an order sealing, until further order of the Court, the Criminal Complaint and all papers submitted in support of this Criminal Complaint, including the affidavit, and the docket. Such sealing is necessary to effectuate the orderly arrest of NAMBIAR and to guard against flight and destruction of evidence.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

     /s/
Jose Silva
Special Agent, IRS-CI

Sworn to before me, via telephone, and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this _7 day of April 2026.

HON. NATHANAEL M. COUSINS
United States Magistrate Judge